(143 App. Div. 229.)

In re SPENSER.

(Supreme Court, Appellate Division, First Department.   March 10, 1911.)

1. ATTORNEY AND CLIENT (§ 53*)—DISBARMENT—PRESUMPTIONS.

Disbarment proceedings against attorneys are not criminal actions, and the statutory rule of no presumption in such cases does not apply.

[Ed. Note.—For other cases, see Attorney and Client, Dec. Dig. § 53.*]

2. ATTORNEY AND CLIENT (§ 44*)—DISBARMENT—EVIDENCE.

Evidence that an attorney solicited business in Paris, and, when he arrived at New York, a Paris attorney sent him a claim, and he collected the money, but failed to account for it, and converted the money to his own use and interposed in his defense, forged documents and false testimony, with knowledge thereof, requires disbarment.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 55, 56, 62; Dec. Dig. § 44.*]

In the matter of Armand Spenser, an attorney.   Proceeding to dis cipline respondent for unprofessional conduct.   Respondent disbarred.

See, also, 136 App Div. 942, 121 N. Y. Supp. 1148; 137 App. Div. 330, 122 N. Y. Supp. 190.

Argued before CLARKE, McLAUGHLIN, SCOTT, MILLER, and DOWLING, JJ.

Einar Chrystie (Paul Fuller, Jr., of counsel), for petitioner.
Louis S. Posner (Walter S. Dryfoos, of counsel), for respondent.

CLARKE, J.   Respondent was admitted to practice as an attorney and counselor at law in the courts of the state of New York in April, 1906.   In November, 1907, he was in Paris.   He had issued a printed circular in the French language: "Armand Spenser, Counsellor at Law, 132 Nassau Street, New York.   Correspondents in North and South America.   Sir: We beg to offer you our services as correspondent and urge your co-operation with reference to matters in North and South America:   1. Collection of claims; moderate fees, contingently, 30% in New York, 35% in the United States and elsewhere," followed by a schedule of various professional services, and concluding, "Address for appointment up to November 30th, 10 Rue de L'Echiquier, Paris."

M. Raymond Couchot-Desforges, an avocat residing at 252 Fau borg Saint Martin, Paris, received this circular, and on November 28th wrote to the respondent, requesting him to call.   Respondent did so on the evening of the day he left Paris to return to the United States. At this interview Mr. Couchot-Desforges placed in the hands of the respondent for collection the claim of his client Pierre Sicard of Cannes against the Meyer Bros. Drug Company of St. Louis, Mo., and delivered to him certain papers relating thereto.   When the respondent returned to New York, in December, 1907, he wrote to the Myer Bros. Drug Company at St. Louis, and received a reply from their attorney, and as a result of the negotiations an agreement was reached that the Meyer Bros. Drug Company should pay, 1,808.50 francs.   The method of payment was for the respondent to draw a draft upon the debtor, attaching thereto papers authenticating the acceptance of the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

compromise and the right to collect, the draft to be paid through Bischoff's Bank in this city. The attorney for the drug company insisted upon the original written proof from Sicard authorizing Couchot-Desforges to receive payment. The respondent during the period of negotiations had quite a correspondence with Couchot-Desforges. He received from him letters dated December 28, 1907, and March 20, 1908. On April 17th he wrote to Couchot-Desforges, referring to his letter of March 20th:

"You have omitted to send me the power of Mr. Sicard to you. Pray send it to me or in default a letter emanating from Mr. Sicard authorizing the compromise. I await the power and as soon as received the debt will be immediately paid."

This evidently crossed a letter from Couchot-Desforges, dated April 11th, in which he inclosed a receipt of Mr. Sicard, regularly legalized by the consul.

On April 28th the draft was paid by Bischoff's Bank, and the respondent received the equivalent of 1,808.50 francs, namely, $358.83. The respondent sent a postal card to Couchot-Desforges, bearing date April 28, 1908, and the post office mailing stamp of April 29th, which he said he wrote and deposited before the payment of the draft, as follows:

"Received your letter of the 11th instant as also the receipt of Mr. P. Sicard, legalized. I am awaiting only the power which the latter has delivered to you."

This was his last written communication to Couchot-Desforges. On the 27th of April Couchot-Desforges had written the respondent:

"It is your fault if we have not succeeded in comprehending each other. You have said to me at the start, 'send me a power, little import whether it emanates from Monsieur Sicard or from you yourself.' However that may be, here is the power which Monsieur Sicard has given me."

The power was inclosed, and, of course, was received some time after the respondent had collected the money.

On July 31, 1908, Couchot-Desforges wrote to the respondent:

"Confirming my letters of 11th of July and my cablegram of the same day, I enjoin upon you again by the present letter the necessity of sending to me the amount of the debt collected by you as I have been apprised by Monsieur Sicard who has himself been informed by Monsieur Meyer. The continuance of your silence will force me to grave measures of severity."

On the 22d of October, 1908, the French Consul in this city brought the matter to the attention of the grievance committee of the bar association, and its attorney communicated with the respondent, who replied on October 27th:

"I hereby beg leave to acknowledge receipt of your favor of the 26th instant. * * * I instructed my representative in Paris to pay Mr. Desforges of Paris a certain sum of money which I believe was paid over. In order to ascertain definitely whether such is the case I have written to Paris and I must therefore await a reply from Paris before I can do anything further in the premises."

Subsequently a hearing was had before said grievance committee, and thereafter these proceedings were instituted. In the course there-

of the petitioner moved for the issuance of a commission to take the testimony of Mr. Couchot-Desforges in Paris, which motion was strenuously opposed by the respondent, but was granted by the court. Matter of Spenser, 137 App. Div. 330, 122 N. Y. Supp. 190. Upon the hearing before the referee, Maxim Spenser, a brother of the respondent, testified that he was living in Paris in the spring of 1908; that he received from the respondent a letter dated April 23d:

"My Dear Maxim: Will you stop one evening at the office of Mr. Couchot-Desforges, No. 252 Fauborg Saint Martin, and show him this letter, by which I introduce you to him as my attorney in fact to settle the affair of Sicard against Meyer Brothers, and to pay him in full as follows: To finish the matter I authorize you to pay to Mr. C.-Desforges what he and I have together agreed, the sum of Fs. 1620 as the proceeds of the collection of the account amounting to Fs. 1808.50. At the same time that you pay these Fs. 1620 to him, send to me, either you or he, a proper receipt. Your brother Armand Spenser."

This letter bears date five days before the receipt of the money by the respondent, and at a time when the attorney for Meyer Bros. Drug Company was still insisting upon the receipt of a power of attorney from Sicard to Couchot-Desforges before payment would be made, as evidenced by his letter to the respondent of April 20th, from St. Louis:

"I am in receipt of your favor of the 17th inst. regarding the power of attorney from Mr. Sicard. I beg to call your attention to your letter of April 1st in which you mentioned that this power of attorney had been executed. I presumed, of course, from this letter that it would be attached to the draft, as an attorney at law, as such, has no implied authority to compromise a debt for his clients. As stated in my last letter, I am extremely sorry for the delay, but if you will examine your letter I believe you will see that I am not at fault."

And as late as the 28th the respondent wrote the postal card quoted, supra, stating that he was waiting for the power. The envelope in which this letter was purported to be received by Maxim is not produced. Maxim further testified that some days after having received this letter he went to the office of Couchot-Desforges, met a gentleman whom he described, who announced himself as Couchot-Desforges, told him that he was Mr. Spenser, a brother of Armand Spenser of New York; that it was about the case, to settle it, of Sicard, and the gentleman asked him if he had the money with him; that he responded, "Yes," that "the man went into another room and I heard him typewriting something, then after ten minutes he came back and gave me this receipt which he signed before me;" that he gave to him 16 bills of 100 francs each and one gold piece of 20 francs, and then came away. This receipt reads:

"M. Couchot-Desforges,
Avocat.         252 Fauborg Saint Martin,
Telephone 403-56.       Paris, May 6, 1908.

"I, the undersigned, hereby acknowledge the receipt of Mr. Armand Spenser, of New York, of the sum of one thousand, six hundred and twenty francs, as a compromise and in full settlement of the bill of September 17th, 1906, of Mr. Pierre Sicard against Messieurs Meyer Brothers of St. Louis, and in settlement of the claim of one thousand eight hundred francs and fifty centimes, the collection of which I had entrusted to him. Of which this is a receipt.

"Yours Truly,           Couchot-Desforges."

Maxim further testified that this receipt was handed to him unfolded and without an envelope; that he had folded it up himself and put it in his pocket, where he had kept it until he had produced it in New York in October, 1908. This receipt was produced and relied upon by the respondent as a complete answer to the charge made against him. Maxim testified that he had never written to his brother informing him that he had carried out his instructions and had paid Couchot-Desforges. He came to New York in September, 1908, and he says that he did not see his brother upon his arrival nor for some weeks thereafter, but that some time in October he gave this receipt to Armand. It will be recalled that in the respondent's letter to the attorney of the grievance committee of October 27th he said that, while he had instructed his representative in Paris to pay Mr. Desforges, in order to ascertain definitely whether the money had been paid, he had written to Paris, and must therefore await a reply. The reason given for requesting Maxim to pay is given by the respondent as follows:

"I had been in Paris a little while before for a little over a year, and I had loaned him 2,000 francs at various times to enable him to start in business for himself as a small contractor, to take orders from private people and from firms, department stores, for orders, to take orders for furs, that is, for jackets, mantles. Also, to enable him to do that, to buy rough skins—in order to make the skins into furs, and during the period of one year, about 13 or 14 months, I had loaned him about 2,000 francs to buy with. I could not specify, once I loaned him 400 francs and 200 francs and 50."

Maxim testified:

"I took my own money because I owed money to my brother. I owed him more than that, only he did not give me the whole amount at one time, in one payment, because I needed it he lent it to me."

Being asked how he procured the money to pay Couchot-Desforges, he testified:

"I had money on me, on my person, in my pocket; and my mother also had money. It was she who kept the money. And there was money which I was about to collect, which I had earned in business, and through my brother-in-law also, I had business with him.

"Q. Where did you get the money that you paid over to Desforges? A. It came from things which I sold, skins which I bought and resold—reparations and alterations. It was all my own money.

"Q. Where was the money on the morning of that day? A. My mother had it. She just kept it herself. She never kept a bank account, cash money. She gave me more than that too. It was my own money. * * * I always used to give her money, didn't have any bank account. Kept no written memoranda of the amount I gave her.

"Q. And how did you keep the run of the amount of your money that she had for you from time to time? A. I had a good memory, that is all.

"Q. How much remained in her possession of your money after she turned over to you this amount? A. I don't remember."

He further testified that his mother was in New York at the time of the hearing, and that she came to New York the year before. She was not produced as a witness.

This alleged receipt is a palpable forgery, apparent upon inspection, established by the evidence, admitted by the respondent before the close of the case, and found by the learned referee. It is typewritten

in French, upon paper bearing the letter heading of Couchot-Desforges, and at a casual glance is similar to his numerous genuine letters in evidence. The genuine letter closest in time to the purported date of this receipt is that of April 27th, Exhibit 3. The paper upon which the receipt is written differs in color, length, and breadth. The letter heading in the genuine letters is clear and clean engraving. The letter heading upon the receipt is testified to have been made by a photo-engraved reproduction; that is, a zinc plate made by photograph from the original. The expense of making such a reproduction in October of 1908 in New York would have been about $1. The French accents were put in by pencil and afterwards inked over, showing that it was an English writing machine, while the genuine letters are in French type. The signature is undoubtedly a simulated forgery.

To account for this paper, proved, admitted, and found to be a forged document, there are three possible hypotheses: First, that Maxim Spenser's story is true; that he did pay 1,620 francs at the office of Couchot-Desforges to some clerk or subordinate of his, and from him received the paper. The paper itself is a complete answer to that hypothesis. It would have been upon the regular office paper. It would have been written upon the office typewriter, with the French accents a part of the type, as in the other letters from the same office, and would have been in the ordinary French form used by the office, which the testimony established this is not. Second. Maxim might have concocted the paper himself. What reason can be suggested for that? If the respondent had sent to him in money the 1,620 francs, it might be that Maxim would have converted them to his own use and manufactured the receipt to show to his brother and exonerate himself. But no money was sent to him. If it be conceded that the letter of April 23d from the respondent to Maxim was genuine, all that it called upon him to do was to pay part of the debt which he owed to Armand to Couchot-Desforges. It is incredible that so elaborate a forgery would have been resorted to for such a purpose. Further, how could Maxim in Paris have procured the paper of Couchot-Desforges to have it photolithographed? If he had procured a sheet of his paper for that purpose, how much easier it would have been to put the receipt upon that original. It should be borne in mind that he testified that he had never heard of Couchot-Desforges until he received the letter from the respondent, and had never seen him except upon the one occasion. This hypothesis must be rejected. Third. That the respondent is responsible directly or indirectly therefor. The facts which we have outlined establish motive and opportunity. The respondent had received the money of his client on the 28th of April, 1908. He has used that money so received for his own purposes, because while he made restitution two years afterwards, while these proceedings were pending, that cannot be taken into consideration in passing upon the charge. Although for five months prior to the collection of the money he had been in constant communication with his client, he did not notify him of its receipt nor communicate with him directly in any way thereafter. Even if we assume, for the purposes of argument, that he directed his brother to pay, he never received from that

brother or from the client any information that his instructions had been carried out until the making of these charges. On the day of the receipt of the money he sent a postal card asking for further proof, and did not countermand it or say "I have received payment which will be transmitted to you in due course through my brother, Maxim Spenser, in Paris, whom I have instructed in that regard." The alleged letter from him to his brother of April 23d is inexplicable upon any reasonable theory. I do not believe it was ever sent, but that it was manufactured after the charges and for the purpose of making a defense. The respondent had the genuine letters of Couchot-Desforges. He had been educated in Paris, was familiar with the French language, and therefore had the knowledge and the instruments necessary for the creation of the forged paper. Couchot-Desforges was beyond the seas. He could not be produced as a witness, and it was believed that in such proceedings his testimony could not be taken by commission. This is evidenced by the strenuous opposition to the motion for a commission and by the arguments and motions upon the hearing before the referee. This is not a criminal case. The Court of Appeals in the Matter of Randel, 158 N. Y. 216, 52 N. E. 1106, in a unanimous opinion, said:

"This is in no sense a criminal proceeding and the statutory rule of no presumption in such cases does not apply."

The facts proven and the fair inferences to be drawn therefrom lead to the inevitable conclusion that the respondent converted his client's money, has interposed in his defense forged documents and false testimony, with knowledge thereof, is guilty of the charges brought against him, is unworthy to continue in the practice of an honorable profession, and must therefore be disbarred. All concur.